[Cite as *State v. Kamleh*, 2012-Ohio-2061.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 97092**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ISSAM KAMLEH

DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-544087

**BEFORE:** Stewart, P.J., Keough, J., and Kilbane, J.
**RELEASED AND JOURNALIZED:** May 10, 2012

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

BY:   Cullen Sweeney
Assistant Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, OH   44113


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY:   Oscar E. Albores
Assistant County Prosecutor
The Justice Center
1200 Ontario Street, 9th Floor
Cleveland, OH   44113

MELODY J. STEWART, P.J.:

{¶1} A jury found defendant-appellant Issam Kamleh guilty of receiving stolen property and possession of criminal tools. The state charged that Kamleh engaged in a scheme with a retail store employee to exploit a loophole in the retailer's cell phone return policy — the employee would buy a cell phone, use an employee code to immediately cancel the contract, but keep the cell phone and then sell it to Kamleh at a price substantially below retail value. Kamleh raises eight assignments of error that challenge the validity of his arrest, the validity of a warrant used to search his house, the sufficiency of the evidence supporting his conviction for receiving stolen property, the use of Evid.R. 404(B) evidence, the jury instruction, the effectiveness of trial counsel, and the length of his sentence.

I

{¶2} Kamleh filed a two-part motion to suppress evidence: the first part challenged whether the police had probable cause to effect his warrantless arrest; the second part complained that the police improperly searched his car following the arrest.

A

{¶3} There are three bases for conducting a warrantless arrest: (1) the arrestee has committed an offense in a police officer's presence (*Gerstein v. Pugh*, 420 U.S. 103, 113,

95 S.Ct. 854, 43 L.Ed.2d 54); (2) the officer has probable cause to believe that the arrestee has committed a felony and that arrest occurs in a public place (*United States v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)); and (3) the officer can make a warrantless entry into a home upon probable cause for an arrest and the circumstances are "exigent" (*Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)).

{¶4} The state claimed that Kamleh was arrested on the second ground: that the arresting officers had probable cause to believe that Kamleh committed a felony and his arrest occurred in a public place. "Probable cause" to arrest exists when an officer is aware of facts that would lead a reasonable person to believe that the suspect has committed or is committing a crime, however minor. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

B

{¶5} During the suppression hearing, the court heard evidence that Wal-Mart employed a man named Jonathan Williams in the "connection center" of its electronics department to handle cell phone sales. Wal-Mart acted as an intermediary for cell phone carriers, meaning that its salespeople handled point of sale cell phone transactions in the store and facilitated contracts for those carriers.

{¶6} Each Wal-Mart connection center received its own "dealer code" that enabled any employee of the connection center to cancel cell phone contracts directly with the carrier. Ordinarily, cell phone purchasers are given a brief period of time in which to

cancel new contracts without paying an early termination fee. When a new contract is canceled with the carrier, the customer is expected to return the cell phone to Wal-Mart, which in turn would return it to the applicable carrier.

**{¶7}** Wal-Mart learned that Williams was either purchasing cell phones and using his dealer code to cancel the contracts or opening a new cell phone line but not signing a contract. In either case, he did not return the cell phone but instead sold them to third parties. He escaped detection because Wal-Mart was unaware of the cancellation (that being a matter between the carrier and customer) and its inventory continued to show that the cell phone had been sold, so the fact that Williams kept the cell phones was consistent with its sales data. Had it not been for another employee who alerted Wal-Mart to Williams's actions, Wal-Mart would not have learned of Williams's scheme until the end of the year, when a carrier would issue Wal-Mart a chargeback for any unreturned cell phones.

**{¶8}** When confronted by Wal-Mart, Williams immediately confessed and implicated Kamleh. Williams said that he was selling the unopened cell phones in their original packaging to Kamleh, who in turn was selling them overseas. Wal-Mart discovered that Williams had done this with at least 20 cell phones, some valued as much as $500 apiece.

**{¶9}** Williams was charged with theft and agreed to cooperate with the police in exchange for a plea bargain. Because Williams's arrest had caused him to be out of contact with Kamleh, the police asked Williams to call Kamleh and reestablish their prior

relationship.  In recorded telephone conversations, Kamleh asked Williams to provide him with new iPhones.  They agreed to meet for a transaction in which Williams would be wired for sound and watched by the police.

{¶10} Because of time constraints, the police were unable to borrow new iPhones, nor were they able to borrow cell phones of similar quality.  Instead, a local retailer allowed them to borrow less desirable, prepaid models.  To these cell phones a police detective added older cell phones that the police had confiscated in other cases.  These were placed in a bag and given to Williams.

{¶11} Williams and Kamleh met in the parking lot of a Wal-Mart store.  When Kamleh saw the bag of cell phones that Williams presented to him, he was disappointed by their lack of quality, telling Williams "there is no market for them."  Williams told Kamleh that he was desperate for cash and would take any amount of money that Kamleh would offer him.  They did not agree on a price, but Kamleh told Williams that "I'll take care of you, you work it out."  Kamleh told Williams that they should go into the store, although it was unclear for what purpose.  Kamleh and Williams exited the car and Kamleh put the bag of cell phones in the trunk.  No money was exchanged.  The police then moved in and arrested Kamleh.

{¶12} The court rejected Kamleh's argument that he did not purchase the cell phones that Williams offered in the buy/bust, so the predicate crime necessary for a valid warrantless arrest did not occur.  It found that "price was discussed, although a definitive

figure in the car was not given, I'll get back to you, we'll talk, we'll take care of this stuff, so that's the price."

C

**{¶13}** Kamleh argues that the court erred by denying the motion to suppress evidence uncovered following his warrantless arrest. He claims that he did not purchase the cell phones offered by Williams in the buy/bust, so he did not receive stolen property or commit any other crime that would permit his warrantless arrest. The state counterargues that Kamleh manifested an intent to purchase the cell phones by telling Williams that he would "take care" of him and took possession of the cell phones by placing them in the trunk of his car immediately before his arrest.

1

**{¶14}** The issue for us to consider is whether the facts and circumstances within the arresting officer's knowledge were sufficient to cause a prudent person to believe that Kamleh had committed, or was committing, the offense of receiving stolen property, thus obviating the need for an arrest warrant. It must be conceded that, unlike their other transactions, no money changed hands between Kamleh and Williams, and they did not settle on a price. So the issue for the court was whether Kamleh's statement that "I'll take care of you, you work it out" and his act of putting the cell phones in the trunk of his car before walking into the store was sufficient to prove that Kamleh took possession of the cell phones.

**{¶15}** R.C. 2913.51(A) states: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." The statute does not require the defendant to purchase the stolen property — taking receipt of the property or retaining it while having reasonable cause to believe that it has been stolen is enough to constitute a commission of the offense.

2

**{¶16}** We will address the issue of whether the evidence showed that Kamleh believed the cell phones he received were stolen later in this opinion. For purposes of the motion to suppress evidence, the question is not what Kamleh believed, but what the police believed. Knowing that Williams admittedly obtained cell phones illegally and sold them to Kamleh, could a reasonable police officer believe that Kamleh took possession of cell phones that he believed to have been stolen, thus constituting the offense of receiving stolen property?

**{¶17}** Williams told the police in detail about the scheme whereby he would take cell phones without paying for them and sell them to Kamleh for a fraction of their true worth and Kamleh would ship them overseas. The police also knew that Kamleh himself encouraged and participated in the scheme by providing Williams with names and social security numbers. The means used to perpetuate the scheme were sufficient to allow the police to conclude that Kamleh was receiving stolen property.

{¶18} Some of the cell phones that Williams offered to Kamleh at the buy/bust were, contrary to their established practice, obviously used and in poor condition. If these had been the only cell phones that Williams offered to Kamleh, the police may not have had probable cause to arrest Kamleh for possession of stolen property because Kamleh may not have believed that the used cell phones were stolen. But some of the phones that Williams offered to Kamleh in the buy/bust were new and in their original packaging. So regardless of whether these new cell phones were not of the same quality that Kamleh was used to buying, they were still new and the police were justified in believing that Kamleh understood that Williams had obtained these less desirable cell phones in the same way that he obtained the more desirable cell phones. The court was thus entitled to find that Kamleh understood that the prepackaged cell phones offered by Williams were stolen.

3

{¶19} The offense of receiving stolen property only requires the state to prove possession of stolen goods — it matters not how the defendant obtained those goods. Nevertheless, evidence that the defendant paid for the stolen goods is an excellent proof of possession. The testimony showed that Williams and Kamleh did discuss a purchase at the buy/bust. Although they did not agree on any price, the court thought that Kamleh's statement that he would "take care" of Williams was enough to allow a reasonable police officer to believe Kamleh intended to take possession of the cell phones. It is difficult to quarrel with this conclusion. Williams essentially told Kamleh

that he would sell the cell phones to Kamleh for any price that Kamleh deemed fair. In response to this offer, Kamleh told Williams that he would "take care" of him. By then placing the cell phones in the trunk of his car, the police could reasonably conclude that Kamleh manifested an intent to take possession of those cell phones. Put differently, Kamleh did not expressly state that he was refusing to take possession of the cell phones, so it was reasonable for the police to assume that he was retaining them.

{¶20} Kamleh testified at the suppression hearing and when asked about placing the cell phones in the trunk of his car said, "[y]eah, but me and him were going to take a walk to Wal-Mart. They're not even worth — if somebody would break into the car, for me to fix the windows it's more expensive than these phones." The monetary value the cell phones held for Kamleh is immaterial to the question of whether he took possession of them despite believing that they had been stolen. Williams testified that he had been out of contact with Kamleh for a few months after his arrest and that Kamleh appeared highly desirous of renewing their relationship. While Kamleh might have thought the cell phones that Williams offered him in the buy/bust were were not suitable for sale to his foreign buyers, he could well have agreed to buy those cell phones as a good faith gesture in an effort to reestablish their prior course of dealing. So for all apparent purposes, the police could reasonably conclude that Kamleh's act of putting them in the trunk of his car was an act manifesting his possession of the cell phones.

4

{¶21} It is true, as Kamleh argues, that the buy/bust arranged by the police did not give them any additional information from that which they obtained from Williams nearly four months earlier. This raises the question of why the police did not make an arrest immediately upon learning of Kamleh's role in Williams's scheme to steal cell phones. Once probable cause exists to arrest a suspect, that probable cause does not continue indefinitely. Indeed, if the police delay in making an arrest when probable cause does exist, "the passage of several weeks [makes] it virtually impossible to establish the impracticability of obtaining a warrant." *State v. Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d (2d Dist.), ¶ 27.

{¶22} It is unclear why the police did not try to obtain an arrest warrant upon learning of Williams's confession and implication of Kamleh. But the delay explains why the police decided to engage in the buy/bust operation. Any new transaction between Williams and Kamleh constituted a separate act of receiving stolen property unrelated to any prior transactions between them. As explained above, that separate incident permitted a warrantless arrest for a felony that occurred in a public place. The delay in executing an arrest warrant was rendered immaterial by the transaction.

D

{¶23} Kamleh next argues that the police improperly executed a warrantless search of his car following his arrest. In his motion to suppress, he argued that the search of the car was an improper inventory search. The state opposed the motion on grounds that it had probable cause to search Kamleh's car based on a belief that it contained contraband.

{¶24} As a general proposition, the police do not need a warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity. *Carroll v. United States*, 267 U.S. 132, 160-162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). The key question is whether the crime observed offers a reasonable basis to believe that the interior of the vehicle contains relevant evidence. Gant had been arrested for driving with a suspended license, so the search of his car would not reasonably provide evidence on that charge. The Supreme Court distinguished *Gant* from *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), where Belton had been arrested on drug charges stemming from a transaction that took place in his car, finding that the police could reasonably believe that the interior of the car held additional evidence.

{¶25} Although Kamleh and Williams were not in the car at the time of their arrest, the police were justified in searching the car based on the reasonable belief that it might have contained other evidence relating to the cell phone scheme. The only purpose of their meeting was for Kamleh to buy stolen cell phones. The police knew from Williams that some of the cell phone sales he previously made to Kamleh occurred inside Kamleh's car. Their belief that they might find additional evidence relevant to the

crime inside the car was reasonable under the circumstances and justified the warrantless search.

E

{¶26} Finally, Kamleh argues that a search warrant for his house, issued the day after his arrest in the buy/bust operation, was tainted by evidence that had been illegally seized during his arrest and the search of his car. These arguments rest solely on the premise that these searches were invalid, a premise we rejected and need not restate here.

II

{¶27} For his second assignment of error, Kamleh complains that his conviction for possession of criminal tools was unsupported by sufficient evidence. The state charged that the tools in question, a safe and $11,172.53 in cash, were used by Kamleh to facilitate his receipt of stolen cell phones. Kamleh argued that the money was given to him by his infirm father, for medical care and expenses.

A

{¶28} We determine whether the evidence is sufficient to sustain a verdict by examining the evidence in the light most favorable to the prosecution and determining whether any rational trier of fact could have found that the prosecution proved the essential elements of the crime beyond a reasonable doubt. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶ 78, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

B

**{¶29}** As charged in this case, the offense of possession of criminal tools states: "No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." R.C. 2923.24(A). In many cases, the alleged criminal tool will have an obvious relationship to the charged offense; for example, a drug scale as it relates to a charge of drug trafficking. When the alleged tool is United States currency, the relationship of the cash to the offense may not be so obvious. In *State v. Blackshaw*, 8th Dist. No. 70829 (May 29, 1997), we quoted *State v. Golston,* 66 Ohio App.3d 423, 431, 584 N.E.2d 1336 (8th Dist.1990), for the proposition that:

> Mere possession of cash is not unlawful. To prove that money is contraband and therefore subject to forfeiture, "the state must demonstrate that is it [sic] more probable than not, from all these circumstances, that the defendant used [the money] in the commission of a criminal offense." (Internal citations omitted.)

**{¶30}** The evidence showed that Kamleh not only used Williams as a supplier of cell phones, but used other persons to purchase cell phones in their names and then turn them over to Kamleh in exchange for cash. One of the persons, Branda Flowers, said that Kamleh paid her $300, all in one hundred dollar bills, from a "wad" of one hundred dollar bills. Williams, too, testified that Kamleh always paid him in one hundred dollar bills. When the police arrested Kamleh, he carried $2,832 in cash, $2,000 of which was banded in fifty and one hundred dollar bills. During a search of the house, the police opened a safe and found another $6,700 in cash that was likewise wrapped in bank bands. In addition to the cash, the safe contained 24, brand new, boxed iPhones.

**{¶31}** Given the large denominations used by Kamleh to pay off those who obtained cell phones for him and the discovery of cash in large denominations found both on him and in his house, coupled with the presence of numerous cell phones, a rational trier of fact could conclude that Kamleh used the cash in furtherance of his scheme to obtain new cell phones. The jury could rationally have rejected Kamleh's assertion that the money in the safe belonged to his father. The presence of so many boxed iPhones stored with the money suggested that the money and cell phones were related, a conclusion that was consistent with the evidence of Kamleh's scheme.

III

**{¶32}** The third assignment of error complains that the court erred by allowing the state to introduce evidence of other acts under Evid.R. 404(B). The evidence consisted of testimony from Branda Flowers, who said that in November 2010, just days before Kamleh's arrest, she obtained about 15 cell phones under Kamleh's direction, that Kamleh paid her $300 for all of those cell phones, that he failed to cancel those contracts as promised, and left her liable to pay off those contracts. Kamleh argues that this testimony was not evidence that Kamleh knew that the cell phones he previously purchased from Williams were stolen. He argues that the cell phones he purchased from Flowers were not obtained by a theft offense, so the facts that Flowers testified to did not prove that he knew that the cell phones he purchased from Williams were illegally obtained.

**{¶33}** Prior crimes committed by a defendant, other than those charged in the indictment, are presumptively irrelevant for purposes of showing that the defendant committed the acts charged in the indictment. This is because of the danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crimes charged in the indictment. *State v. Cotton*, 113 Ohio App.3d 125, 131, 680 N.E.2d 657 (1st Dist.1996). Evid.R. 404(B) creates an exception, however, for certain acts if they prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In *United States v. Cadet*, 664 F.3d 27, 32-33 (2d Cir.2011), the court stated:

> When "other act" evidence is offered to show knowledge or intent in particular, as opposed to other non-propensity purposes such as proof of identity or corroboration of witnesses, such evidence must be "sufficiently similar to the conduct at issue" to permit the jury to draw a reasonable inference of knowledge or intent from the other act. * * * Evidence of other acts need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent. (Citations omitted.)

**{¶34}** Kamleh defended the receiving stolen property charge by claiming that he did not know that the cell phones he bought from Williams had been stolen. The state countered this defense by using Flowers's testimony to prove that Kamleh was familiar with the idea that he could purchase a cell phone on contract from a carrier for far less than the retail price of the phone itself (cell phone companies subsidize the high cost of a cell phone in exchange for a contract), cancel the contract, and keep the cell phone.

{¶35} Flowers's testimony established that Kamleh independently knew that he could purchase cell phones on contract, cancel the contract, and keep the cell phones. This was essentially the same scheme executed by Williams. To be sure, the facts involving Flowers differed slightly from those involving Williams because Kamleh did not cancel the contracts on the cell phones that Flowers bought. But Flowers testified that Kamleh persuaded her to buy the cell phones in her name because he said he was going to cancel those contracts. The fact that he did not cancel those contracts as promised allowed the jury to draw a reasonable inference that he intended to keep the cell phones regardless of whether there was an existing contract. So while the circumstances described by Flowers were not identical to those involving Williams's case, they were sufficiently similar that the court did not abuse its discretion by allowing Flowers to testify.

IV

{¶36} Kamleh next argues that the court erred by failing to instruct the jury on accomplice testimony and other acts evidence.

A

{¶37} Kamleh claims he requested an instruction on accomplice testimony, but in a later assignment of error he claims that trial counsel was ineffective for failing to seek that same instruction. We find nothing in the record to show that Kamleh requested an instruction on accomplice testimony, nor did he specifically object to the court's jury instructions on this ground, so he has waived all but plain error. *See* Crim.R. 30(A).

**{¶38}** There being no express request for an accomplice instruction, we look to three factors to determine whether a trial court's failure to give the accomplice instruction constitutes plain error under Crim.R. 52(B):

> (1) whether the accomplice's testimony was corroborated by other evidence introduced at trial; (2) whether the jury was aware from the accomplice's testimony that he benefitted from agreeing to testify against the defendant; and/or (3) whether the jury was instructed generally regarding its duty to evaluate the credibility of the witnesses and its province to determine what testimony is worthy of belief.

*State v. Woodson*, 10th Dist. No. 03AP-736, 2004-Ohio-5713, at ¶ 18; *State v. Bentley*, 11th Dist. No. 2004-P-0053, 2005-Ohio-4648, at ¶ 58; *State v. Jones*, 5th Dist. No. 10CA3366, 2011-Ohio-1108, ¶ 30.

**{¶39}** Williams's testimony was largely corroborated by Kamleh himself. Kamleh conceded that he purchased the cell phones from Williams but denied culpability for receiving stolen property on grounds that he did know that Williams was acting illegally by not returning the cell phones after he had cancelled the contracts. The jury knew that Williams agreed to cooperate with the police as part of his plea bargain, a fact divulged in the extensive testimony concerning the buy/bust operation. Finally, the court instructed the jury that it was the sole judge of the weight and credibility of the evidence. We therefore find that any error by the court in failing to give an accomplice instruction did not rise to the level of plain error.

## B

**{¶40}** Kamleh next complains that the court gave a truncated instruction on other acts evidence that was inadequate because it failed to identify what the other acts were

(the Flowers transactions), failed to tell the jury that it could only consider the other acts testimony for a specific purpose, and failed to inform the jury that it had to assess independently Flowers's credibility.

**{¶41}** As Kamleh is forced to concede, the court instructed the jury that:

> Evidence of other crimes, wrongs, not necessarily crimes, wrongs or other acts is not admissible to prove the character of the person in order to show that they acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.

**{¶42}** This instruction did not name the specific factor named in the rule that the state relied upon for admitting the evidence of other acts. We have noted that a "shot-gun-style approach" to the use of Evid.R. 404(B) should be avoided and that the court should limit an other-acts instruction "to the stated purpose for which the other-acts evidence was introduced." *State v. Yancy*, 8th Dist. Nos. 96527 and 96528, 2011-Ohio-6274, fn. 2. *See also United States v. Spikes*, 158 F.3d 913, 929 (6th Cir.1998).

**{¶43}** Kamleh did not ask the court to give a more refined other-acts instruction. Although the court's jury instruction should have specified the purpose for allowing the other acts evidence, the failure to do was harmless error. Kamleh has not challenged the sufficiency or weight of the evidence supporting his conviction for receiving stolen property. The state presented compelling evidence to show that he was aware that Williams had been unlawfully obtaining the cell phones that he purchased. Apart from the rather obvious implications of paying a mere fraction of the retail cost of the 35

high-end cell phones he purchased from Williams, Kamleh facilitated the thefts by providing Williams with the names, social security numbers, and driver's licenses of two other persons so that Williams could use their names on the contracts. Indeed, when Williams wrecked his car and thought he might have to quit his job for want of transportation, Kamleh began driving him to and from work. The state thoroughly rebutted Kamleh's claim that he did not know that the cell phones he bought from Williams were stolen by showing that he separately engaged in a similar course of conduct with Flowers and did not even bother cancelling those contracts. Finally, Kamleh was not a small-time operator — the large amount of cash and brand new iPhones found in his house was ample evidence that he was operating a cell phone racket. The jury could easily have rejected Kamleh's claim that he thought Williams was doing nothing more than exploiting a loophole that allowed him to cancel contracts without returning the cell phones.

## C

**{¶44}** Kamleh also complains that the court should have instructed the jury that it could not consider remarks made by a police officer that the 15 iPhones found in Kamleh's safe were the subject of a different police investigation.

**{¶45}** Kamleh objected to the other acts instruction on grounds that the "evidence presented of other unindicted charges should not be considered as to * * * his guilt or innocence in this case." Although not specifically mentioning the iPhones as the subject of the objection, that omission was immaterial given that the court did give a standard

other acts instruction that evidence of other acts was not admissible to prove "the character of the person in order to show that they acted in conformity therewith." Having failed to inform the court of the precise basis for his objection, the court had no obligation to give a more specific instruction.

V

**{¶46}** The fifth assignment of error complains of several instances in which trial counsel was ineffective: counsel elicited and failed to object to irrelevant and prejudicial evidence that Kamleh was being investigated for other crimes;  counsel failed to object to improper witness bolstering; counsel failed to object to testimony regarding Kamleh's decision to invoke his right to an attorney during his police interview; counsel failed to ensure that Kamleh received a proper interpreter; and that counsel failed to ensure that the court gave proper jury instructions on accomplice and other acts testimony.  After reviewing the record, we find that most of the arguments Kamleh makes deal with trial strategy.  The only instances meriting discussion are that trial counsel failed to object to testimony concerning Kamleh's invocation of the right to counsel and that trial counsel failed to ensure that Kamleh received a proper interpreter at trial.

A

**{¶47}** A claim of ineffective assistance of counsel requires a defendant to show that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington*, 466 U.S. 668, 104

S.Ct. 2052, 80 L.Ed.2d 674 (1984). This analysis requires two distinct lines of inquiry. First, we determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client[.]" *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. When making this inquiry, we presume that licensed counsel has performed in an ethical and competent manner. *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 209 N.E.2d 164 (1965). Second, we determine whether "the defense was prejudiced by counsel's ineffectiveness." *Bradley*, 42 Ohio St.3d at paragraph two of the syllabus. Prejudice requires a showing to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at paragraph three of the syllabus.

B

**{¶48}** The police advised Kamleh of his *Miranda* rights following his arrest and he agreed to speak with the police. Kamleh told the police that he possessed the large number of cell phones found in his residence because he operated a cell phone store. When asked if he "followed up" on the cell phone store claim during the interview, a detective testified:

> He [Kamleh], when we interviewed him, the interview was brief, he asked for an attorney, and at that point in time we stopped the interview. The only information I was ever able to gain from him was that he claimed to be selling them at a place called LA Wireless in Michigan.

**{¶49}** During cross-examination of this detective, defense counsel asked, "[n]ow, there was something else that you said before; that Mr. Kamleh wouldn't cooperate and asked for an attorney?" The detective replied, "[h]e stopped the interview * * * and

requested an attorney." Defense counsel then asked whether Kamleh had been polite and had "answered every question that was posed?" The detective conceded that he had not watched the entire interview and that he derived his knowledge of how the interview ended from the report of that interview. The jury watched a videotape of that interview, including Kamleh's invocation of the right to counsel. At no point did defense counsel object.

{¶50} The state is not allowed to comment on a defendant's post-*Miranda* silence for impeachment purposes because the *Miranda* warnings implicitly assure a defendant that he will not be penalized for remaining silent. *Doyle v. Ohio*, 426 U.S. 610, 618-619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). To allow otherwise would permit the state to suggest that the defendant's retention of counsel indicates guilt. *Id.*

{¶51} The detective's testimony on direct examination did not imply that Kamleh invoked his right to counsel in a manner that suggested his guilt, nor was the detective's answer prompted by the state's questioning. Defense counsel might have left the matter as it was, but instead chose to ask more questions on cross-examination. We presume the competence of licensed counsel, *State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1978), and, as a general proposition, defer to counsel on matters of trial strategy. *State v. Carter*, 72 Ohio St.3d 545, 558, 1995-Ohio-104, 651 N.E.2d 965. Perhaps defense counsel thought that he needed to blunt the impact of the detective's testimony by going on the offensive to show that Kamleh had cooperated in the interview. Admittedly, this might not be considered to be a winning strategy. But our standard of review in

ineffective assistance of counsel cases does not permit us to find a violation of counsel's essential duties based on a mere disagreement with defense counsel tactics. Even a questionable trial strategy does not compel a finding of ineffective assistance of counsel. *State v. Smith*, 89 Ohio St.3d 323, 328, 2000-Ohio-166, 731 N.E.2d 645 (2000).

**{¶52}** Even if we were to assume that defense counsel's actions fell below the objectively reasonable standard of professional representation, we cannot say that there is a reasonable probability that, but for counsel's actions, the outcome of the trial would have been different. The state had significant evidence to show that Kamleh knew he was buying stolen cell phones from Williams. What is more, the state proved that Kamleh facilitated the theft by providing Williams with the names and identification numbers of uninvolved third parties so that Williams could take out cell phone contracts in names other than his own. Despite Kamleh's claim that he thought Williams was doing nothing more than exploiting a loophole in Wal-Mart's sales policy, the offense of receiving stolen property required the state to prove only that Kamleh have reasonable cause to believe that the cell phones had been stolen. Kamleh claimed to be a cell phone dealer himself — surely he would have understood that a party cancelling a new cell phone contract would not have been allowed to keep an expensive cell phone on the pretext of a "loophole."

C

**{¶53}** Kamleh also argues that defense counsel failed to ensure that he received a proper interpreter. The court allowed Kamleh's aunt to act as "sort of an interpreter,"

telling the jury that "[w]e're supposed to be able to provide interpretative services, but it's almost impossible to do that."

**{¶54}** R.C. 2311.14(A)(1) states that the court shall appoint an interpreter whenever a person "cannot readily understand or communicate" in a legal proceeding. Before assuming the duties of an interpreter, the interpreter must take an oath that "the interpreter will make a true interpretation of the proceedings to the party or witness, and that the interpreter will truly repeat the statements made by such party or witness to the court, to the best of the interpreter's ability."  R.C. 2311.14(B).

**{¶55}** Consistent with the court's statement that the aunt would act as "sort of an interpreter," Kamleh's aunt did not swear an oath as required by R.C. 2311.14(A)(1). But by all appearances, her interpreting services were not required.  As Kamleh concedes, "he has some level of English proficiency[.]" This is too modest — the videotape of his interview with the police shows that he easily understood the English language and used colloquialisms that were consistent with someone who had more than just a passing proficiency with the language.  Moreover, the court heard Kamleh testify during the suppression hearing and as the transcript of that hearing showed, Kamleh had no difficulty understanding the proceedings or communicating.  At all events, the aunt's presence was nothing more than an accommodation to caution in the event Kamleh might need assistance.  At no point in the record is there the least indication that Kamleh needed the assistance of an interpreter.  Any objection by defense counsel would not only have been unnecessary, but futile.

## VI

{¶56} The receiving stolen property count contained a forfeiture specification for the $11,172.53 found on Kamleh's person and in his safe. In its verdict, the jury specifically found that the cash was not subject to forfeiture. At sentencing, the state asked that it be permitted to hold the cash recovered from Kamleh at the time of his arrest as possible evidence in the event a retrial is ordered. The court granted the state's request over a defense objection. The state now concedes that it did not seek forfeiture of those funds and "plans to return said funds at the conclusion of this case[.]" In the event the money has not been returned to Kamleh, we sustain this assignment of error with instructions for the court to order the state to return any funds seized from Kamleh.

## VII

{¶57} At sentencing, Kamleh addressed the court and continued to insist upon his innocence, claiming that he trusted the wrong person. The court rejected Kamleh's statement, saying that he acted according to a "well-executed plan" and that Kamleh's "fate was sealed * * * when you took this young lady [Flowers] * * * with you and she did the same thing you did." Kamleh complains that the court erred by relying on uncharged conduct in sentencing him.

{¶58} In *State v. Cooper*, 8th Dist. No. 93308, 2010-Ohio-1983, we held that "a defendant's uncharged yet undisputed conduct may be considered in sentencing without resulting in error when it is not the sole basis for the sentence." *Id*. at ¶ 15 (citations omitted). This is a familiar point of law. For example, incarcerated defendants who are

being resentenced often ask for leniency based on their conduct while incarcerated. *State v. Jackson*, 8th Dist. No. 92365, 2009-Ohio-4995, ¶ 10. The exception occurs when the court considers acts for which the defendant was acquitted or conduct for charges that had been reduced by virtue of a plea bargain. *State v. Williams*, 8th Dist. No. 79273, 2002-Ohio-503; *State v. Russo*, 8th Dist. No. 78096 (May 31, 2001).

**{¶59}** Flowers's testimony remained undisputed during the trial. The court was thus entitled to consider it when deciding on Kamleh's sentence.

VIII

**{¶60}** In his eighth assignment of error, Kamleh complains that the court abused its discretion by ordering him to serve one-year sentences on each count, with those sentences to run consecutive to each other. He primarily argues that his sentence was disproportionately longer than that given to Williams, who he notes actually stole the cell phones in question.

**{¶61}** Although the court did not specifically reference the relevant statutory guidelines during the sentencing, its journal entry imposing sentence does state that it "considered all required factors of the law" and further states that a prison term "is consistent with the purpose of R.C. 2929.11." The court's statement that it considered the required statutory factors, without more, is sufficient to fulfill its obligations under the sentencing statutes. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 18; *State v. Wright*, 8th Dist. No. 95096, 2011-Ohio-733, ¶ 4.

{¶62} We next consider whether the court abused its broad sentencing discretion by ordering Kamleh to serve the one-year prison terms consecutively. *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus.

{¶63} Kamleh was given a lengthier sentence for receiving the stolen cell phones than Williams received for the actual theft of the cell phones. But Williams pleaded guilty and agreed to cooperate with the investigation and prosecution of Kamleh, so the court could take that fact into account when sentencing. The state is permitted to encourage guilty pleas by offering substantial benefits to a defendant. *Corbitt v. New Jersey*, 439 U.S. 212, 223-24, 99 S.Ct. 492, 499-500, 58 L.Ed.2d 466 (1978).

{¶64} Moreover, even though Kamleh was not the one who actually stole the cell phones, the evidence showed that he encouraged Williams to continue to do so after Williams expressed a desire to stop. Kamleh even duped the unsuspecting Flowers into buying cell phones, leaving her to foot the bill for those cell phones. The sheer number of cell phones found in his possession and the large amount of cash recovered from him indicated that Kamleh was operating on a large scale. Given these facts, along with Kamleh's refusal to accept responsibility for his actions, we cannot find that the court abused its discretion in sentencing.

{¶65} Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____

MELODY J. STEWART, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
MARY EILEEN KILBANE, J., CONCUR