[Cite as *State v. Fornore*, 2012-Ohio-5339.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                          )        CASE NO.    11 CO 36
                                        )
     PLAINTIFF-APPELLEE,              )
                                        )
VS.                                     )        O P I N I O N
                                        )
ALONZO FORNORE,                         )
                                        )
     DEFENDANT-APPELLANT.            )


CHARACTER OF PROCEEDINGS:               Criminal Appeal from Common Pleas
                                        Court, Case No. 09CR55.


JUDGMENT:                               Affirmed.


APPEARANCES:
For Plaintiff-Appellee:                 Attorney Robert Herron
                                        Prosecuting Attorney
                                        Attorney John Gamble
                                        Assistant Prosecuting Attorney
                                        105 South Market Street
                                        Lisbon, Ohio  44432

For Defendant-Appellant:                Attorney Desirae DiPiero
                                        7330 Market Street
                                        Youngstown, Ohio  44512


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite


                                        Dated: November 19, 2012

VUKOVICH, J.

**{¶1}** Defendant-appellant Alonzo Fornore appeals from his conviction and sentence entered in the Columbiana County Common Pleas Court for possession of drugs. There are four issues in this case. The first two issues address the trial court's denial of Fornore's suppression motion. The first is whether the trial court erred in finding that there was probable cause for the warrantless arrest. The second is whether the trial court erred in finding that Fornore voluntarily consented to the search of his hotel room. The third issue is whether the state committed discovery violations and, if so, was the proper remedy for those violations dismissal of the indictment. The fourth issue is whether the trial court abused its discretion in denying Fornore's request for expert funds to reweigh the drugs.

**{¶2}** For the reasons expressed below, the judgment of the trial court is hereby affirmed. Specifically as to the issues raised, there was probable cause for the warrantless arrest, Fornore voluntarily consented to the search of his hotel room, the trial court did not abuse its discretion for failing to dismiss the indictment based on alleged discovery violations and lastly, the trial court did not abuse its discretion in denying Fornore's request for expert funds.

Statement of the Case and Facts

**{¶3}** On March 1, 2008 Fornore paid cash to rent room 216 at the Comfort Inn in East Liverpool. He originally rented the room for two nights but decided to extend his stay for an additional night. The room was registered in his name.

**{¶4}** During his stay, a Comfort Inn employee noticed a lot of traffic in and out of Fornore's room. The employee did an internet check of Fornore and discovered that he had prior drug convictions. The employee contacted St. Clair Township Police Department on March 3, 2008 about the suspicious activity. Officer Troy Walker received the call. In addition to being a St. Clair Township Police Officer, he is also assigned to the Drug Enforcement Agency as a task force officer.

**{¶5}** After receiving the information, Officer Walker drove to the Comfort Inn and set up surveillance in the back parking lot of the hotel. Officer Walker observed a black Cadillac that was registered to Allen Fornore, Fornore's brother. He also saw

a silver Honda that was registered to Julia Lewis, whose son is Jamie Lewis, a known drug user in the area. Officer Walker saw Jamie Lewis and a female leave the hotel, get into the Honda and leave.

{¶6} At that point Officer Walker called Detective Kelsey Hedrick for help in the surveillance. Detective Hedrick took over the surveillance of the back of the hotel, while Officer Walker moved to the front of the hotel, across the street.

{¶7} Detective Hedrick observed three separate individuals he knew to be drug users arrive separately and enter the Comfort Inn. 06/08/11 Tr. 79-83. One was a black male identified as Clarence Morgan. 06/08/11 Tr. 79. Morgan arrived at the hotel and went to the back door with something wrapped in a garbage bag, which was later identified as a flat screen television set. Fornore was seen meeting Morgan at the back door. Morgan exited the Inn shortly after he entered but this time he was empty handed. 06/08/11 Tr. 81. The second was Maria Arehart, a known drug user. 06/08/11 Tr. 83. The third was Tracey Dorsey.

{¶8} Once Clarence Morgan was identified, Officer Walker called for more help in setting up security. Officer Walker then went into the hotel and obtained the key for Room 217, the room across the hall from Fornore's. Officer Walker did surveillance from that room through the peep hole. 06/08/11 Tr. 14. Officer Walker confirmed through his surveillance at that position that both Arehart and Dorsey entered Fornore's room and left shortly after entering the room. 06/08/11 Tr. 16, 82-83.

{¶9} Officer Walker contacted the patrol officers on duty to give them a description of the cars these individuals were in. The car Arehart was in was stopped. She was wanted for questioning for a credit card theft investigation so she was taken to the police station for further questioning. Officer Walker called Special Agent Rapp and Task Force Officer Bruce Papalia to take over surveillance. Officer Walker then went to the police station to question Arehart. Crack cocaine and heroin were on her person. 06/08/11 Tr. 23.

**{¶10}** Two other vehicles that contained people seen leaving Fornore's room at the Comfort Inn were stopped. However, no drugs were found on their person or in the vehicles.

**{¶11}** Officer Walker then called the prosecutor to get a search warrant for the hotel room Fornore rented. Surveillance continued and a few other people who were seen spending short periods of time in Fornore's room were stopped.

**{¶12}** Prior to a search warrant being issued, Officer Walker received a phone call from one of the officers on the surveillance team. He was informed that Fornore had been arrested.

**{¶13}** The officers doing surveillance came up with a ruse to lure Fornore out of his room. Agent Kochanowski telephoned Fornore from the front desk telling him that he accidently hit Fornore's vehicle and asked if he could come outside to assess the damage. Fornore exited his room and started to walk down the hall. Approximately six officers exited the room across the hall, ordered him to the ground, handcuffed him and arrested him. 06/08/11 Tr. 99, 128. All officers were carrying firearms and had them drawn, which purportedly was their common practice in situations such as these. 06/08/11 Tr. 99-100, 124 (Agent Rapp and Panezott testimony). Agent Rapp then read Fornore his *Miranda* rights. 06/08/11 Tr. 100. Fornore was then asked if he was willing to speak to law enforcement officers; he responded that he was willing. 06/09/11 Tr. 101.

**{¶14}** Thereafter, Fornore was moved to Room 217. Sergeant John Panezott asked Fornore if he would consent to the search of Room 216, which he did. 06/08/11 Tr. 129. Fornore signed a form consenting to the search of his room and the vehicle. 06/08/11 Tr. 130. Fornore told the sergeant that he did not have drugs in the room but he had about $2,700 in the room from old drug sales. 06/08/11 Tr. 129-130. During the search of Room 216, crack cocaine was found hidden in the coffee filter of the coffee pot. Grinders were found that tested positive for heroin. Heroin, pills and wrapping paper were also found.

{¶15} Following the search, Fornore was released and given one of the task force officer's business card. The officers were seeking his cooperation in further drug investigations; they wanted to know his supplier. 06/08/11 Tr. 136-137.

{¶16} Fornore was indicted approximately one year after the incident for possession of heroin in violation of R.C. 2925.11(A), a fourth-degree felony; for possession of crack cocaine in violation of R.C. 2925.11(A), a second-degree felony; and for possession of Methadone Hydrochloride in violation of R.C. 2925.11(A), a fifth-degree felony. 03/26/09 Indictment. Two suppression motions and two supplements to the suppression motions were filed in the case. 08/12/09 Motion to Suppress and Dismiss; 08/06/10 Motion to Suppress; 04/01/11 Supplement to Motion to Suppress; 07/11/11 Supplement to Motion to Suppress. The assertions in these motions were that the consent to search the room was not voluntary and there was no probable cause for the arrest. The trial court overruled the motions to suppress. 08/02/11 J.E.

{¶17} The hearings on the motion to suppress were held on June 8, 2011 and July 13, 2011. During the June 8, 2011 hearing, Task Force Officer Panezott testified that he spoke with Fornore on March 4 and 11, 2008. During the March 11, 2008 interview, Fornore agreed to let the officers search his residence. Those reports were not given to defense counsel until July 5, 2011.

{¶18} At the July 13, 2011 hearing, it was revealed that there was other contact initiated by the Drug Enforcement Agency with Fornore, but it was not related to this case. 07/13/11 Tr. 44. Statements made in connection with that contact were not turned over to defense counsel or the state.

{¶19} On August 26, 2011 based on the undisclosed statements, Fornore filed a motion for discovery sanctions arguing that the state's dilatory conduct warranted dismissal. The trial court overruled that motion. 09/08/11 J.E.

{¶20} Around that same time, the state discovered that the analyst who originally weighed the drugs was unavailable to testify at trial. Thus, the state had the drugs reweighed. Upon reweighing, the drugs weighed less than what they

originally weighed. The state disclosed the reports to the defense. Fornore then requested money for an independent analyst  The trial court denied the request.

**{¶21}** Thereafter, Fornore entered a no contest plea to the indicted charges. The trial court accepted the plea, found him guilty and sentenced him to an aggregate sentence of five years.  10/31/11 J.E.  He received 18 months for possession of heroin, five years for possession of crack cocaine and 12 months for possession of methadone hydrochloride.  Those terms were ordered to run concurrent to each other.

**{¶22}** Fornore timely appeals asking this court to overturn the trial court's suppression ruling, to overrule the trial court's ruling on the motion for discovery sanctions and to overrule the trial court's denial of the motion for funds for an independent expert.

<u>Standard of Review</u>

**{¶23}** The first two assignments of error address the trial court's suppression ruling.  Appellate review of a suppression decision presents a mixed question of law and fact.  *State v. Roberts,* 110 Ohio St .3d 71, 2006–Ohio–3665, 850 N.E.2d 1168, ¶ 100. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.  *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).  Thus, a trial court's factual findings are afforded great deference and an appellate court will accept them if they are supported by competent, credible evidence.  *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982).  That said, the trial court's legal conclusions are reviewed *de novo*.  *State v. Burnside,* 100 Ohio St.3d 152, 2003–Ohio–5372, 797 N.E.2d 71, ¶ 8.

**{¶24}** With that standard in mind, we now turn to the first assignment of error.

<u>First Assignment of Error</u>

**{¶25}** "The trial court erred in denying appellant's motion to suppress because his warrantless arrest violated the Fourth Amendment to the United States Constitution and Art.1 § 14 of the Ohio Constitution."

**{¶26}** It is undisputed that this was a warrantless arrest that occurred in the hallway of the Comfort Inn after a ruse was used to lure Fornore out of the room.

**{¶27}** There are three bases for conducting a warrantless arrest. *State v. Kamleh*, 8th Dist. No. 97092, 2012-Ohio-2061, ¶ 3. The first is that the arrestee has committed an offense in a police officer's presence. *Gerstein v. Pugh,* 420 U.S. 103, 113, 95 S.Ct. 854 (1975). The second is that the officer has probable cause to believe that the arrestee has committed a felony and that arrest occurs in a public place. *United States v. Watson,* 423 U.S. 411, 418, 96 S.Ct. 820 (1976). The third is that the officer can make a warrantless entry into a home upon probable cause for an arrest and the circumstances are "exigent." *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091 (1984).

**{¶28}** It is undisputed that Fornore did not commit an offense in any of the officer's presence. Thus, the first basis cannot be found.

**{¶29}** The third basis also does not apply. It is acknowledged that it has been held that a hotel room is equivalent to a home for purpose of the third basis. *Johnson v. U.S.,* 333 U.S. 10 (1948). However, the officers did not enter the hotel room to make the arrest. Rather, the arrest occurred in the hotel hallway, a public place. Our sister district has held that once a defendant opens the door of the hotel room to the police, he is exposing himself and the hotel room to public view. *State v. Norris*, 2d Dist. No. 17689, 1999 WL 1000034 (Nov. 5, 1999). Thus, once Fornore left the hotel room he was no longer in a private dwelling with the expectation of privacy, but rather was in the public hallway.

**{¶30}** Admittedly, a ruse was used to draw Fornore from his room. However, that does not negate any probable cause that led up to the arrest. *Fair v. Jones*, E.D.Mich. No. 05-CV-72036-DT, 2007 WL 201013 (Jan. 22, 2007) (arrest was not invalid under the Fourth Amendment when police used a ruse to get Petitioner to come to the police station to effectuate his arrest). *See, e.g., Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (police lie to defendant that co-defendant had confessed did not render defendant's confession involuntary); *United States v. Maldonado,* 472 F.3d 388, 2006 WL 3598525 (5th Cir. Dec.12, 2006)

(approving of police use of cocaine deal as a ruse to locate and arrest defendant); *United States v. Flynn,* 309 F.3d 736, 738-39 (10th Cir.2002) (police creation of a ruse to cause defendant to abandon property, which is subsequently seized and used as evidence against him, was not illegal); *Alvarez v. Montgomery Co.,* 963 F.Supp. 495, 498-99 (D.Md.1997) (officers' use of misrepresentation to draw defendant from home and effectuate a warrantless arrest was proper), *aff'd.* 147 F.3d 354 (4th Cir.1998); *United States v. Vasiliavitchious,* 919 F.Supp. 1113, 1115-18 (N.D.Ill.1996). It has even been held that a misrepresentation can be used to draw a defendant from the home to effectuate a warrantless arrest. *Alvarez v. Montgomery Co.,* 963 F.Supp. 495, 498-99 (D.Md.1997). In coming to that determination the court discussed a treatise on Search and Seizure that explained:

> Though some of the cases on outside-the-threshold arrests have not even considered how it was that the defendant came to be there rather than inside, others have given specific attention to the police action which caused the arrested person first to leave the interior of the residence. It has been deemed unobjectionable that the defendant came outside at the request of police who did not reveal their intention to arrest, or, indeed, even that the police engaged in some affirmative misrepresentation, such as that they merely wanted to discuss matters with him or that he was viewed by them only as a suspect or a witness. Such ruses have been considered permissible because ... "in other contexts, courts have considered the police tactic of misinformation and have found no constitutional violation." Here again, however, the warrantless arrest will be illegal if the defendant's presence outside was acquired by coercion or a false claim of authority (e.g., that otherwise they would be entitled to enter the premises). (Footnotes omitted) Wayne R. LaFave, *Search and Seizure* (Third Ed.1996), § 6.1(e).

*Id.*

**{¶31}** Therefore, considering all of the above, the only applicable standard is the second basis – that the officer has probable cause to believe that the arrestee

committed a felony and the arrest occurs in a public place. As established above, the arrest did occur in a public place. Thus, the issue is whether there was probable cause.

**{¶32}** "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795 (2003). However, "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, * * * and that the belief of guilt must be particularized with respect to the person to be searched or seized * * *." *Id.,* citing *Ybarra v. Illinois,* 444 U.S. 85, 91,100 S.Ct. 338 (1979). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Pringle* at 371, quoting *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657 (1996).

**{¶33}** The circumstances the officers knew prior to making the arrest are as follows. An employee from the Comfort Inn contacted the police because they noticed a lot of traffic in and out of Fornore's room. Fornore paid cash for his stay and extended the stay for another day. Paying cash is typically done when the occupant does not want a room to be traced and occurs often in drug transaction situations. 06/08/11 Tr. 120-121. Due to those facts, the employee from Comfort Inn did a search for Fornore's criminal history and discovered that he had a criminal record for drugs and weapons. Once surveillance was set up by the officers, they observed at least three individuals known to be drug users enter the Comfort Inn and at least two of those people entered Fornore's room, stay less than 10 minutes, and then left. Traffic stops were initiated on two of those people and drugs were found on one person. Due to all that and the amount of traffic coming in and out of Fornore's room, the officers believed that drug activity was going on.

**{¶34}** It has been explained that a police officer may draw inferences based on his own experience in deciding whether probable cause exists. *State v. Young,*

5th Dist. No. 2011CA00122, 2011-Ohio-4750, ¶ 25, citing *United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585 (1975). The majority of the officers doing the surveillance had experience with the Drug Task Force. These officers testified that from all the information they believed drug activity was occurring. Given the facts as recited above and in the factual description of the case, there was probable cause for the arrest. The trial court's ruling on the suppression motion regarding this issue is affirmed. This assignment of error lacks merit.

### Second Assignment of Error

**{¶35}** "The trial court erred in denying Appellants' motion to suppress because Appellant did not voluntarily consent to the warrantless search of his hotel room."

**{¶36}** Next, Fornore argues that the search of his hotel room was the fruit of his illegal arrest and any evidence obtained must be suppressed. As stated above, the trial court found that the arrest was legal. Our review of the first assignment of error concludes that that ruling was correct. Thus, the search of the hotel room is not a fruit of an illegal arrest since there was probable cause for the arrest.

**{¶37}** In anticipation of that ruling, Fornore alternatively argues that he did not voluntarily consent to the search of his hotel room and without a search warrant the officers had no right to search the room.

**{¶38}** As previously mentioned the Fourth Amendment of the United States Constitution protects persons against unreasonable searches and seizures. Search warrants are preferred, however, a valid consent renders a warrantless search constitutional. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041 (1973). "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances." *State v. Chesrown*, 9th Dist. No. 26019, 2012-Ohio-2476, ¶ 10 quoting *Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417 (1996), citing *Bustamonte,* at 248–249. It is the state's burden to prove that consent was given freely and voluntarily and was not obtained through coercion. *State v. Posey,* 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1998).

{¶39} Neither party disputes the fact that Fornore signed a paper that gave his consent to search his hotel room and car. The written consent to search was admitted into evidence and clearly states "I FREELY CONSENT TO THIS SEARCH." State's Exhibit 1. Fornore's admits he initialed next to that sentence. The consent form also contains his signature and states that it was signed after *Miranda* rights were read to him. Nothing on the form indicates that the officers in any manner altered it.

{¶40} Despite that form, Fornore contends that the consent was involuntary because it was given under coercion. He asserts that once the phony call came he left his room. He alleges that six or seven officers then came from different directions, threw him to the floor and put their knee in his back. He was then handcuffed and taken to the room next door. 07/13/11 Tr. 69. While this occurred the officers' guns were drawn. He states when he was taken to the other room, he could not see the door and was not free to leave. 07/13/11 Tr. 71. They told him he was facing 10 years in the penitentiary. 07/13/11 Tr. 72. He claimed that the agents were yelling at him, were hostile towards him and that he felt he could not refuse to consent. 07/13/11 Tr. 76. He also stated that he only consented to the search of the automobile, not the room. 07/13/11 Tr. 74. He claimed that he was high when he gave consent.

{¶41} The agents offer a different version of what occurred. There were six officers with guns drawn when Fornore was brought to the floor and handcuffed. He was then read his *Miranda* rights by Officer Rapp and asked whether he would be willing to talk to the officers. He responded that he would. He was then moved to Room 217. Sergeant John Panezott asked Fornore is he would consent to the search of Room 216, which he did. 06/08/11 Tr. 129. His handcuffs were removed at some point during the conversation. According to Sergeant John Panezott only Fornore, himself, and Special Agent Kochanowski were in the room. He did note that Special Agent Rapp was in the room briefly. 06/08/11 Tr. 129. The officers acknowledged that Fornore was not free to leave at that point. The officers that were in the room did have guns on their person, however, there is no indication in the

record that the guns were drawn when the officers were asking for consent. Furthermore, the officers indicated that it did not appear to them that Fornore was under the influence of any substance. 06/08/11 Tr. 102; 07/13/11 Tr. 30. Also, according to the officers, they did not volunteer the information about Fornore's potential penalty. Rather he asked what he was facing and he was calm and cooperative.

**{¶42}** The trial court believed the officers and found that while Fornore was not free to leave, his consent was voluntarily given. As previously explained, in ruling on a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *Mills*, 62 Ohio St.3d at 366, 582 N.E.2d 972. Accordingly, a trial court's factual and credibility determinations are afforded great deference, and we will accept them if they are supported by competent, credible evidence. *Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583.

**{¶43}** The testimony offered by the officers is competent and credible. Considering the use of the surprise tactic and the fact that there were six armed officers, it is believable that Fornore could have felt coerced into giving consent for the search of his room. However, it is also just as believable that an arrestee that is as familiar with the criminal justice system as Fornore was would ask what he was facing and would be cooperative because he would know that possibly he could obtain a more lenient sentence if he cooperated and offered information about who was supplying him with the drugs. Furthermore, Fornore signed the consent form and waived his *Miranda* rights. Thus, the trial court's holding that consent was voluntarily given is upheld. This assignment of error does not have merit.

<u>Third Assignment of Error</u>

**{¶44}** "The trial court erred when it denied Appellant's motion for discovery sanctions (Motion to Dismiss) and as a result violated his right to due process of law as secured by the Fourteenth Amendment to the United States Constitution."

**{¶45}** This assignment of error concerns alleged discovery violations. Fornore met with Task Force Officer Panezott twice after his March 3, 2008 arrest. The first

occurred on March 4, 2008 and the second occurred on March 11, 2008. The discovery dismissal motion was based on the fact that the summary of the March 4 and 11, 2008 meetings were not provided before July 5, 2011.

**{¶46}** The March 4, 2008 statement was taken the day after the arrest. It does contain information concerning the March 3, 2008 drug bust. It states that he bought cocaine from a Keith Pete, Derrick Davis and Nathanial Hodge, checked into the Comfort Inn in East Liverpool and sold crack cocaine during his 3 day stay at the Inn. That report also indicates Fornore's history in drug dealing and information that he had regarding who killed Antwan Richardson, one of Fornore's former suppliers, in 2007. The amount of information in this statement that concerns the March 3, 2008 incident is minimal, but incriminating.

**{¶47}** The second statement that occurred was on March 11, 2008. In that statement, there was no discussion of the March 3, 2008 incidents. Rather, the interview concerned consent to search Fornore's residence and further discussions of Richardson's murder. Paraphernalia items were found during the search of Fornore's residence in Youngstown. However, charges as to those items were not included in the 2009 indictment; that indictment concerned solely the March 3, 2008 incident.

**{¶48}** The state contends that it did not know of the March 4 and 11, 2008 statements until the first suppression hearing on June 8, 2011 when Officer Panezott testified about the statements. It claims that when it received the copies of the statements from the DEA it promptly forwarded those copies to Fornore. The transcript from the July 13, 2011 second suppression hearing indicates that the statements were promptly forwarded after their receipt by the prosecutor. 07/13/11 Tr. 7-8.

**{¶49}** Crim.R. 16 governs discovery and discovery violations. Crim.R. 16(B)(1)(f) states that, "[u]pon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment." If the state violates Crim.R.

16(B)(1)(f), Crim.R. 16(E)(3) permits the court to "make such order as it deems just under the circumstances." The court has discretion under Crim.R. 16(E)(3) to determine the appropriate response for failure of the state to disclose material subject to a valid discovery request. *State v. Wiles*, 59 Ohio St.3d 71, 78-79, 571 N.E.2d 97 (1991). This discretion should be exercised to impose a sanction "that is reasonably related to the offensive or noncompliant conduct and the impact of that conduct upon the ability of the defendant to present a defense." *State v. Crespo,* 7th Dist. No. 03 MA 11, 2004-Ohio-1576, ¶ 13.

{¶50} Given the state's action of promptly forwarding the statements to the defense, we cannot conclude that the trial court abused its discretion in denying the motion to dismiss based on alleged discovery violations. That said, even if sanctions were warranted, given the fact that the statements the state knew of were disclosed shortly after receiving them from the DEA, a continuance, at most, would have been warranted, not dismissal as Fornore requested. Since the failure to grant a continuance is not argued in this assignment of error, we do not need to address whether the trial court erred in failing to grant a continuance.

{¶51} Fornore also contends that the DEA has other statements that he made that it has not turned over and that discovery violation sanctions are warranted on these failures to disclose. First, we note that the harm to the state is just as great as the harm to defense counsel. In fact, it may be even greater to the state. The state is the only party that did not know of the statements made. Fornore, who made the statements, should have known when the statements were made and what was stated. The state was not a party to those conversations, rather the U.S. DEA was a party to those statements as well as Fornore. Moreover, as the state points out, this issue regarding other statements that were made by Fornore that were not testified about or were not disclosed is not ripe for review. Our sister district has explained that there is a requirement that the accused submit an affidavit or statement summarizing the testimony desired and its relevancy so that the Department of Justice could consider the request and determine whether to grant permission for the testimony. *State v. Hudson*, 8th Dist. No. 91830, 2009-Ohio-6454, ¶ 32. This avenue

of permission was obtained for the other testimony offered by the DEA officers. However, it was not followed for any of the other alleged statements that Fornore made to the officers. Thus, we cannot review whether or not the items should have been disclosed. For that reason alone, Fornore's argument concerning these other alleged statements lacks merit.

**{¶52}** Consequently, for all the above reasons, this assignment of error lacks merit; the trial court did not abuse its discretion in failing to dismiss the cause based on alleged discovery violations.

<u>Fourth Assignment of Error</u>

**{¶53}** "The trial court abused its discretion when it denied appellant's motion for expert funds, thus depriving appellant of of [sic] due process of law pursuant to U.S. Const. Amends. V and XIV and Ohio Const. Art. 1 § 16."

**{¶54}** This assignment of error concerns the weighing of the drugs found in Fornore's hotel room. The drugs were originally weighed by the state on April 14, 2008, but had to be reweighed on September 12, 2011, because the original analyst was not available to testify at trial. There were differences between those reports. Fornore requested funds for an independent analysis, which the court denied.

**{¶55}** We have previously explained:

The decision to appoint an expert is left to the trial court's broad discretion and its decision will not be reversed absent an abuse of that discretion. *State v. Wells* (Mar. 22, 2000), 7th Dist. No. 98–JE–3, at 8, 2000 WL 309401; see, also, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, paragraph four of the syllabus. The phrase "abuse of discretion" connotes more than an error of law or judgment; it implies the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

When deciding whether to appoint an expert witness at the state's expense, the trial court must consider the following three factors: (1) the effect of the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the

government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided. *Mason* at 149, 694 N.E.2d 932. When considering these factors, the trial court must consider the value of the expert assistance to the defendant's proper representation at either the guilt or sentencing phase and the availability of alternative devices that would fulfill the same functions as the expert assistance sought. *Jenkins* at paragraph four of the syllabus.

In order to receive an expert witness at the state's expense, the defendant must demonstrate more than a mere possibility of assistance from an expert. *State v. Campbell* (2000), 90 Ohio St.3d 320, 328, 738 N.E.2d 1178; *State v. Abelt* (2001), 144 Ohio App.3d 168, 174, 759 N.E.2d 847. At a minimum, the indigent defendant must present the trial judge with sufficient facts which will demonstrate a particularized need for the expert requested. *State v. Nields* (2001), 93 Ohio St.3d 6, 12, 752 N.E.2d 859; *Abelt.* "Undeveloped assertions that the proposed assistance would be useful to the defense are patently inadequate." *State v. Wright* (Sept. 27, 2001), 7th Dist. No. 97 CO 35, 2001 WL 1685275, at * 2.

"[D]ue process does not require the provision of expert assistance relevant to an issue that is not likely to be significant at trial. Nor does due process require that an indigent defendant be provided all the assistance that a wealthier counterpart might buy. Rather, he or she is entitled only to the basic and integral tools necessary to ensure a fair trial." *Mason* at 149, 694 N.E.2d 932.

*State v. Evans,* 153 Ohio App. 3d 226, 2003-Ohio-3475, 792 N.E.2d 757, ¶ 12-14.

{¶56} Fornore was charged with possessing more than 1 gram but less than 5 grams of heroin, a fourth-degree felony. There were two exhibits that were collected that contained heroin – exhibit 2 and 4. During the first weighing exhibit 2 weighed 1.5 grams (net weight) and exhibit 4 weighed 4.3 grams (net weight), which

measured together weighed more than 5 grams. At the second weighing exhibit 2 weighed .95 grams (net weight) and exhibit 4 weighed 2.4 grams (net weight). Added together this still was more than 1 gram but less than 5 grams.

**{¶57}** Fornore was also charged with possessing crack cocaine where the amount involved was more than 10 grams but less than 25 grams, a second-degree felony. Exhibits 1, 3, and 6 contained crack cocaine. At the first weighing exhibit 1 weighed 2.2 grams (net weight), exhibit 3 was 24.1 grams (net weight), and exhibit 6 was residue. This added together actually weighed more than 25 grams, but he was not charged with possessing more than 25 grams. At the second weighing exhibit 1 weighed 1.5 grams (net weight), exhibit 3 weighed 21.2 grams (net weight), and exhibit 6 was residue. This was more than 10 grams but less than 25 grams.

**{¶58}** Lastly, Fornore was charged with possessing Methadone Hydrochloride a fifth degree felony. The first weighing of the Methadone Hydrochloride was 1.7 grams (net weight), which was 7 tablets. The second weighing was .88 grams (net weight). Pursuant to R.C. 2925.11(C)(1)(a) this slight difference does not change the status as a fifth degree felony.

**{¶59}** We have previously explained that crack cocaine is a compound mixture that contains some water. *State v. Jones*, 7th Dist. No. 06MA17, 2007-Ohio-7200, ¶ 23, 40. When it is first made, it is wet but it dries out. *Id.* at ¶ 25. Thus, weighing it shortly after it is made and then five months later will result in different weights. *Id.* at ¶ 11, 13, 21, 34. As such, there is a logical reason for the differences in the weight of the crack cocaine.

**{¶60}** As to the other two drugs, the state points out that a portion of the substance is consumed for analysis. Thus, that is a potential reason for the different measurements. While it is logical that that would occur, nothing in the record indicates that such proposition is correct and case law is extremely limited in this area.

**{¶61}** Regardless, although there are admittedly differences between the weights on the 2008 weighing and the 2011 weighing, the weights do not alter the degree of the offense. Therefore, the trial court did not abuse its discretion when it

denied the request to have funds for an independent analysis. This assignment of error is without merit.

## Conclusion

{¶62} All four assignments of error lack merit. There was probable cause for the warrantless arrest. There is credible evidence supporting the trial court's factual conclusion that Fornore voluntarily consented to the search of his hotel room. Any alleged discovery violation did not warrant dismissal of the indictment. Thus, the trial court did not abuse its discretion by denying the discovery sanction request. Lastly, the trial court did not abuse its discretion by denying the request for funds for an expert to independently weigh the drugs obtained in the search.

{¶63} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
Waite, P.J., concurs.