[Cite as *State v. King*, 2013-Ohio-4791.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 99319

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DOMINIQUE KING

DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED IN PART; REVERSED AND
### VACATED IN PART

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-556997

**BEFORE:** Kilbane, J., E.A. Gallagher, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** October 31, 2013

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East 4th Street
Second Floor
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
James M. Price
Assistant County Prosecutor
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} Defendant-appellant, Dominique King ("King"), appeals from his conviction for murder, felonious assault, aggravated riot, and having a weapon while under disability. For the reason set forth below, we affirm in part, reverse in part, and vacate the conviction in Count 7.

{¶2} On December 6, 2011, King and codefendants, J.C., A.K., and T.W., were indicted for aggravated murder; murder; and two counts of felonious assault, in connection with the November 26, 2011 shooting death of A.O. ("the victim"); attempted aggravated murder of "John Doe," an individual later identified as P.L.; and three counts of aggravated riot. All counts included one- and three-year firearm specifications. King was also charged with one count of having a weapon while under disability. He pled not guilty and waived his right to a jury trial as to the charge of having a weapon while under disability. The matter proceeded to trial on June 12, 2012. At the start of the trial, the court determined that two of the charges of aggravated riot were duplicative, and the state elected to dismiss one of those charges as set forth in Count 7. (Tr. 1031.)

{¶3} The state's evidence demonstrated that on October 12, 2010, a Glenville High School student was robbed at gunpoint by "R.J." and another man. During the course of the investigation of that incident, P.L. admitted to participating in this armed robbery and also implicated R.J. As a result, R.J. faced felony charges in connection with the armed robbery, but P.L. was charged as a juvenile and received probation. P.L.'s

disclosure created tension between two groups of friends: the victim-P.L. group, and the A.K.-R.J. group who considered P.L. to be a "snitch."

**{¶4}** On November 26, 2011, a Cleveland Heights High School student invited friends to her house for her 16th birthday party. Approximately 35 people attended this party, including the victim, his brother, S.F., Sh.F., P.L., and others. According to the testimony of P.L., when King, A.K., and J.C. arrived, soon thereafter, A.K. made a remark to P.L. about snitching.

**{¶5}** The victim's brother testified that as he and his friends were about to leave the party, the victim bumped into someone, and then a fight erupted outside of the house. The police arrived, and everyone fled.

**{¶6}** After that, the victim, S.F., Sh.F., P.L., and the victim's brother, walked with several others to the Sunoco station located at Superior and Lee Road in Cleveland Heights. The victim and his brother went inside and bought something to eat. According to A.W. who was in the area, King, A.K., J.C., G.B., and T.W., subsequently arrived at the Sunoco station in a silver Audi. G.B. and P.L. began to yell at each other, and A.K. began to fight with S.F. or Sh.F.

**{¶7}** According to S.M., an employee at the Sunoco station, the fight spilled out onto Lee Road. The Sunoco station had video surveillance, but the fight occurred in an area away from the security camera.

**{¶8}** A shot rang out, and the victim was struck in the abdomen. According to A.W., the shot came from the area of the gas pump where King was standing with several

other people.  According to the victim's brother, no one from his group had a gun.  King and his friends then got into the silver Audi, and P.L. and others from that group smashed the back window as the vehicle fled the scene.

{¶9}  Cleveland Heights police sergeant, Sean Corrigan ("Sergeant Corrigan"), and police officer Michael Reese ("Officer Reese") were among the first to respond to the scene.  According to these witnesses, the victim was unresponsive and having difficulty breathing.  They administered aid until Cleveland Heights paramedics arrived and transported the victim to MetroHealth Medical Center.

{¶10} The officers observed that there were about 20 people at the scene, and most were about 18 years old.  P.L., J.M., S.F., and the victim's brother provided the police with a description of the vehicle involved in the shooting, a silver vehicle with tinted windows and a smashed windshield and sunroof.  One of the males also directed the officers to a facebook page, which he stated contained information about the assailant. The four men were brought to the police station for further questioning, and Sergeant Corrigan collected some of their clothing for DNA testing.  Sergeant Corrigan also obtained their cell phones and wrapped them in tin foil in order to prevent remote deletion of messages.

{¶11} Deputy Coroner Joseph Felo ("Felo") testified that the victim died of a gunshot wound that penetrated his liver, pancreas, and aorta, and came to rest at his spine. There was no gunshot powder near the wound.  There was evidence of three blunt force injuries that could have been incurred during a fight just before the time of death. Trace

Evidence Examiner Curtiss Jones ("Jones") testified that he performed trace metal examinations of the victim's hands, which were negative for handling metal. Gunshot residue testing of the victim's clothing was also negative, meaning that he was at least four or five feet away from his assailant at the time of the shooting.

{¶12} The host of the birthday party subsequently told the police that during the party J.C., A.K., and three others had briefly stopped at her house during the party, and they left in a grayish Honda. She identified J.C. and A.K. in a photograph.

{¶13} A.K. testified that he entered into a plea agreement with the state whereby he would plead to one count of aggravated riot in exchange for his testimony against King. He testified that on the night of November 26, 2011, he was with T.H. in Collinwood. He received a call from J.C., and King then picked up T.H. and A.K. King was driving a silver Audi. They drove to a party in Cleveland Heights and saw S.F., Sh.F., and the victim. After about 15 minutes, they went to King's house on Lakeshore Boulevard. About 20 minutes after arriving at King's house, King received a call from G.B. Shortly thereafter, G.B., T.W., and a third man arrived at King's house. The entire group then returned to the party in Cleveland Heights. As they arrived, there were two police cars there and the party was over. The men then decided to go to the Sunoco station because King said that he needed gas. At that point, there was a large crowd at the gas station, which included many of the people who had been at the party.

{¶14} According to A.K., G.B. was arguing with someone and both of these men then began to square off as if to box one another. S.F. or Sh.F. then took a swing at A.K.,

and they began to fight. J.C. also began to fight with someone from G.B.'s group. A.K. heard a gunshot and fled back to King's car. At that point, King was near his car. A.K. observed King holding the handle of a gun and trying to put the gun back inside his jacket. Individuals from the P.L. group then jumped on the car as King, A.K., J.C., and T.H. fled the scene. King became afraid and repeatedly stated that he did not know why he did it. They returned to King's house, and he begged the group not to say anything to police.

{¶15} A.K. further testified that King was afraid to take anyone home because the window of his car was smashed, so T.W. took King home in his silver Honda. A.K. left an identification card in King's car. He was subsequently arrested at school. A.K. further stated that he initially lied to the police and did not state that he was with King. The police told him to tell them who was driving the car or he would be prosecuted for the shooting.

{¶16} G.B. testified that he learned that P.L. was looking for him. By the time he and T.W. arrived at the party, the police were there. Some girls from the party went to the Sunoco station, so King drove there in his car with T.H., J.C., and A.K. G.B. and T.W. drove to the Sunoco station in T.W.'s car. P.L.'s group was already at the station, and G.B. and P.L. began to fight. According to G.B., A.K. joined the fight, but King was not involved in it. A gunshot rang out, and G.B. stated that he observed King running back toward his car and putting a gun in his pants. After they returned to King's house, King stated that he did not mean to shoot the victim. King stated that J.C. disposed of the gun. King then asked J.C. to go with him to find it. G.B. acknowledged that in exchange for

his proffer of testimony in this matter, he was not bound over for prosecution and was ultimately released by the juvenile court.

{¶17} T.W. testified that, as part of his plea deal in this matter, he pled to one count of attempted tampering with evidence and agreed to testify against King. He did not see anyone with a gun at the time of the shooting, but he testified that afterward J.C. told him to go back to look for the gun.

{¶18} J.C. testified that, as part of his plea deal in this matter, he pled to one count of aggravated riot and agreed to testify against King. According to this witness, King had a black gun in his jacket immediately after the shooting. As the group fled the Sunoco station following the shooting, King gave him a gun and had him get rid of it. J.C. reportedly threw it out of the window, and King then changed his mind and wanted the group to go back and find the gun.

{¶19} Prior to the close of the state's case, the trial court, over the objection of the defense, revived the aggravated riot charge set forth in Count 7.

{¶20} The jury subsequently convicted King of murder, a lesser charge of aggravated murder in Count 1 of the indictment; guilty of murder as alleged in Count 2; guilty of felonious assault from Counts 3 and 4; and guilty of aggravated riot in Counts 7 and 8. The court found King guilty of having a weapon while under disability as alleged in Count 9.

{¶21} On July 6, 2012, on the basis of newly discovered evidence, King filed a motion to set aside the verdict, or in the alternative a motion for a new trial. The trial

court held a hearing on the motion on November 13, 2012.  On November 14, 2012, the trial court determined that there was no legal or factual basis for granting the motion.  At the sentencing hearing on November 29, 2012, the trial court determined that the convictions in Counts 2-8 merged into his conviction for murder in Count 1.  King was sentenced to a term of 15 years to life, plus three years for the firearm specification, and a concurrent 18-month term of imprisonment on the weapons while under disability charge.

{¶22} King now appeals, assigning six errors for our review.

Assignment of Error One

The trial court erred in issuing two prejudicial Howard instructions to a jury deadlocked three times.

{¶23} Within this assignment of error, King asserts that after the jury advised the court that it could not reach an unanimous verdict, the trial court issued erroneous supplemental instructions.

{¶24} Where it appears to a trial court that a jury is incapable of reaching a consensus, the court, in its discretion, may make a last-ditch effort to prod the jury into reaching a unanimous verdict so long as its instructions are balanced, neutral, and not coercive.  *State v. Howard*, 42 Ohio St.3d 18, 24, 537 N.E.2d 188 (1989).[1]

---

[1] The Howard charge states that "[t]he principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict.  In a large proportion of cases, absolute certainty cannot be attained or expected.  Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be.  There is no

**{¶25}** As an initial matter, we note that the determination of whether a jury is irreconcilably deadlocked is within the discretion of the trial court. *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 127, quoting *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 37.

**{¶26}** Further, there is no bright-line test to determine what constitutes an irreconcilably deadlocked jury. *Id.* There is no formula or required period of time a trial court must wait before issuing a Howard instruction. *State v. Shepard*, 10th Dist. Franklin No. 07AP-223, 2007-Ohio-5405, ¶ 11-12; *State v. Morgan*, 8th Dist. Cuyahoga No. 97934, 2012-Ohio-4937.

**{¶27}** With regard to the issuance of a Howard charge following 5.5 hours of deliberations, we note that in *Morgan*, this court approved the reading of a Howard charge after the jury had indicated three times that they were deadlocked and after one and one-half days of deliberations. The court stated:

---

reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors."
*Howard,* at paragraph two of the syllabus.

> Other courts have upheld the issuance of a *Howard* charge after shorter periods of time where the jury appeared deadlocked. *State v. Rhines*, 2d Dist. No. 24417, 2012-Ohio-3393 (charge issued after 11 hours of deliberations); *State v. McDowell*, 10th Dist. No. 10AP-509, 2011-Ohio-6815 (charge given after jury deliberated one-and-a-half days); *State v. Shepard*, 10th Dist. No. 07AP-223, 2007-Ohio-5405, ¶ 11 (citing cases where the charge has been upheld after only a few hours of deliberations).

*Morgan* at ¶ 21.

{¶28} In this matter, the record reflects that the jury began deliberating on June 20, 2012 at 3:30 p.m., and worked for one hour. They resumed at 8:35 a.m. on June 21, 2012, and at 9:37 a.m., the jury asked about the next step in the event they could not reach a unanimous verdict.

{¶29} In response, and following the agreement of the parties, the court determined that it would instruct the jury to "keep deliberating." At that point, defendant's counsel suggested that the court give the jury the "Super Howard" charge, leading to the declaration of a mistrial, but the trial court declined to do so and instead instructed the jury: "You are ordered to continue deliberations." (Tr. 1445.) There was no objection from either party at this time.

{¶30} Later that afternoon, at 4:30 p.m., the jury informed the court:

> The jury cannot make an unanimous decision, we are in the exact same spot as this morning.

{¶31} The court stated:

> [Y]ou have not been deliberating an excessive period of time. This is a difficult job, we understand, to collaboratively talk about evidence over several days. We are dealing with people that have no track record working together. We are respectful of all of that, but you have not been deliberating such an excessive period of time that I should say anything more to you than what I'm going to say. (Tr. 1451.)

**{¶32}** The court then instructed the jury to go home and to resume deliberations in the morning. Neither party raised any objection. (Tr. 1452.)

**{¶33}** We conclude that the trial court did not abuse its discretion in instructing the jury to continue deliberating, after they had deliberated for 5.5 hours in this case. The trial court was within its discretion to determine that the jury was not irreconcilably deadlocked and in giving the supplemental charge in order to challenge them to reach a consensus.

**{¶34}** As to the issuance of the supplemental charge, in light of the jury's three statements that it could not reach an unanimous verdict, the decision in *Morgan,* 8th Dist. Cuyahoga No. 97934, 2012-Ohio-4937, is again instructive, as this court approved the reading of a Howard charge after the jury had three times indicated that it was deadlocked. Again, we find no abuse of discretion.

**{¶35}** Insofar as defendant may be asserting that the trial court should have given the "Verdict Impossible" instruction, a.k.a. "Super Howard charge" 4 Ohio Jury Instructions (1992) 118, Section 415.50(4), approved in *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993), we note that this decision is also within the discretion of the trial court. *Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 37-39. Moreover, the *Martens* court explained that such an instruction should not be given prematurely in order to advance the goal of the Howard charge of encouraging a verdict where one can conscientiously be reached.

{¶36} We find no abuse of discretion. Less than six hours of deliberations had occurred, and the case involved extremely serious charges, multiple defendants, 17 witnesses and numerous exhibits. It was proper for the trial court to encourage a verdict if appropriate. *Accord State v. Hawk*, 5th Dist. Knox No. 2009 CA 000028, 2009-Ohio-6965, ¶ 56.

{¶37} As to the content of the charge, we note that the record indicates that the prosecutor and defense counsel agreed to the modified charge as initially given, and the court then instructed the jury to "resume deliberations." The charge was balanced, neutral, and not unduly coercive. Therefore, we find no prejudicial error in connection with the content of the Howard charge.

{¶38} The first assignment of error with without merit.

## Assignment of Error Two

The manifest weight of the evidence did not support Appellant's convictions.

{¶39} When reviewing a claim challenging the manifest weight of the evidence, the court, after reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

> A conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. Credibility determinations

on conflicting testimony are issues primarily reserved to the trier-of-fact to be second-guessed only in the most exceptional case.

*State v. McVay*, 10th Dist. Franklin No. 98AP-1246, 1999 Ohio App. LEXIS 4609 (Sept. 30, 1999); *State v. Robinson*, 2d Dist. Montgomery No. 17393, 2001 Ohio App. LEXIS 238 (Jan. 26, 2001).

**{¶40}** In this matter, most of the individuals at the gas station denied seeing the shooter. J.M., P.L., S.F., and the victim's brother did not see who fired the weapon. In addition, King's relationship to the dispute was not shown, and he was standing apart from those who were fighting. Nonetheless, the state's evidence indicated that the individuals with King had a dispute with the victim's group that began after the Glenville robbery and continued at the Sunoco station after the party. Eyewitness A.K. observed King putting a weapon back into his jacket immediately after the shooting. The attackers fled in King's car, and according to A.K., King acknowledged his responsibility for the shooting immediately afterward. J.C. saw King with a black gun with a pearl handle immediately after the shooting, and King told J.C. to dispose of it. G.B. observed King putting the gun in his pants as he ran back to his car. We therefore cannot say that the jury lost its way in convicting defendant of the offenses.

**{¶41}** This assignment of error is without merit.

Assignment of Error Three

Insufficient evidence supported Appellant's convictions.

**{¶42}** In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus

**{¶43}** King was convicted of two counts of murder, pursuant to R.C. 2903.02(A)(1); two counts of felonious assault, pursuant to R.C. 2903.11; two counts of aggravated riot, pursuant to R.C. 2917.02; one count of having weapons while under disability, pursuant to R.C. 2923.13(A)(2); and firearm specifications, pursuant to R.C. 2941.145. King does not assert the state failed to prove an element of the offenses of which he was convicted; rather, he argues mistaken identity.

**{¶44}** The state's evidence indicated that the individuals with King had a dispute with the victim's group that began after the Glenville robbery and continued at the Sunoco station after the party. Eyewitness A.K. observed King putting a weapon back into his jacket immediately after the shooting. The attackers fled in King's car, and according to A.K., King acknowledged his responsibility for the shooting immediately afterward. J.C. saw King with a black gun with a pearl handle immediately after the shooting and told J.C. to dispose of it. G.B. observed King putting the gun in his pants as he ran back to his car. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that there was sufficient evidence to support the convictions.

{¶45} This assignment of error is without merit.

{¶46} We noted, however, that after the state dismissed the aggravated riot charge set forth in Count 7, the court "revived" this count and King was later convicted of it. The entry of a nolle prosequi before a defendant has been placed in jeopardy, relegates the parties to the position in which they stood prior to the filing of the affidavit, indictment, or information. *Columbus v. Stires*, 9 Ohio App.2d 315, 317, 224 N.E.2d 369 (10th Dist.1967). Accordingly, the trial court was without authority to revive Count 7 once it had been dismissed. Therefore, this conviction must be vacated and this portion of the judgment is reversed.

## Assignment of Error Four

The trial court erred in denying Appellant's postconviction motion for a new trial under Crim.R. 16.

{¶47} Within this assignment of error, King maintains that the state failed to disclose exculpatory evidence in that it did not disclose T.H.'s pretrial statement to prosecutors that he did not see King with a gun on the night of the shooting. King asserts that there was a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the trial court erred in denying his motion for a new trial.

{¶48} In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Id*. at 86. In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed

material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

{¶49} The decision to grant or deny a motion for a new trial pursuant to Crim.R. 33 is within the sound discretion of the trial court. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 82. To warrant the granting of a new trial, the new evidence must, at the very least, disclose a strong probability that it will change the result if a new trial is granted and must not be merely cumulative to former evidence. *Id.* Defendant also argues that he is entitled to a new trial.

{¶50} At trial, T.H. testified that earlier that night, he, King, A.K., and J.C. drove in King's car to the party. The defense subsequently objected to the late disclosure of this witness. The prosecuting attorney indicated that during the original discovery, he had only a nickname for this individual, and that after learning his actual name, he was listed in a new witness list served to defense counsel on June 8, 2012, or a few days before trial.[2] This was accessed electronically by the defense on June 11, 2012. The prosecuting attorney stated that T.H. refused to speak with police prior to trial, and he did not know what T.H. would testify to and offered to call a different witness to the stand in order to give defense counsel an opportunity to interview T.H. At that point, the court ended T.H.'s testimony. He was not recalled to the stand thereafter by either party.

---

[2]The record indicates that A.W. testified that T.W. was called "T," and that A.K. testified that T.H. was called "T." It is unclear whether this was the basis of confusion over T.H.'s actual name.

**{¶51}** On September 24, 2012, King filed a motion to set aside the verdict, or in the alternative, for a new trial. He complained that he was not given the affidavit in support of the search warrant, a video, and other evidence. In a supplemental motion, he complained that he was not given exculpatory evidence as T.H. averred in his affidavit of September 4, 2012, as follows in part:

4. I never saw Dominique involved in the fight.

5. I heard a gunshot and ran to Dominique's car.

6. I never saw Dominique with a gun on his person or with him in the car at any time surrounding the incident involving [the victim].

7. After the gunshot, I panicked and ran to Dominique's car.

8. I "zoned out" and do not remember much after getting into Dominique's car.

9. Before Dominique's trial commenced, I was contacted by Assistant County Prosecutors * * *.

10. I told [the prosecutors] exactly what was stated above.

11. I made the Prosecutor privy to this information/evidence prior to trial.

**{¶52}** At the November 13, 2012 hearing on the matter, T.H. testified that prior to his testimony during trial, he informed the prosecuting attorneys, in a telephone call, that when the group left the gas station in King's car following the shooting, he did not see King with a gun. On cross-examination, T.H. admitted that he initially feared that he was a suspect in the shooting so he retained counsel and refused to speak with detectives investigating the matter. He also stated that prior to testifying, he told the prosecuting

attorney that he did not remember anything, and that *he did not remember* seeing defendant with a gun.

**{¶53}** The trial court denied the motion on November 14, 2012, and ruled as follows:

> No misconduct of the prosecuting attorney was established. All failures of timely discovery established in the evidence were inadvertent and promptly cured by the state when the failure was detected by the prosecutors. The evidence did not establish that the defense of the defendant suffered from late discovery of these items. The court notes that when this late discovery was provided during trial, defendant's counsel did not request any delay in trial proceedings to provide time for him to review and react to the belated discovery. By the same token, the state provided good reason why it could only identify [T.H.], a witness, shortly before trial. When [T.H.] was called to the stand, defense counsel was given time to interview him and did not do so, even though the prosecutor told counsel that it was unknown what [T.H.] would testify to. The court does not find [T.H.] told the prosecutors prior to being called to the stand that he did not see King with a gun. [T.H.] was evasive on that point on the witness stand during the hearing on this motion.

**{¶54}** From the foregoing, we cannot say that a *Brady* violation occurred herein. Although T.H. testified on direct examination that he did not see defendant with a gun, he stated on cross-examination that prior to testifying, he told the prosecuting attorney that he did not remember anything, and that *he did not remember* seeing King with a gun. The trial court, therefore, did not err insofar as it determined that "[t]he court does not find [T.H.] told the prosecutors prior to being called to the stand that he did not see King with a gun." Further, in our view, there is no reasonable probability that the statement that T.H. did not see King with a gun, if it had been disclosed to the defense, would have changed the result of the trial. T.H. repeatedly stated that he did not remember what happened

after he got into King's car, and he gave a similar response to other questions. Significantly, the trial court found that T.H. was evasive during his testimony on the motion for a new trial. That conclusion is not erroneous based upon the record presented. The defense did not suffer prejudice with regard to this new statement.

{¶55} Moreover, we cannot conclude that the trial court abused its discretion in ruling that King was not entitled to a new trial pursuant to Crim.R. 33. In light of T.H.'s admission on cross-examination that *he did not remember* seeing King with a gun, the trial court's conclusion was reasonable and a sound exercise of its discretion.

{¶56} This assignment of error is without merit.

## Assignment of Error Five

The trial court erred in failing to warn the jury of the nature of accomplice testimony.

{¶57} When a defendant is charged with complicity and his accomplice testifies, R.C. 2923.03(D) requires the court to instruct the jury as follows:

> The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

{¶58} The purpose of this instruction is to inform the jury that the testimony of an accomplice is inherently suspect and must be "viewed with suspicion and weighed with

caution." *State v. Hall*, 8th Dist. Cuyahoga No. 2013-Ohio-2900, citing *State v. Bell*, 8th

Dist. Cuyahoga No. 97123, 2012-Ohio-2624, ¶ 37.

{¶59} At trial, King did not request an instruction regarding accomplice testimony,

so this issue is waived absent plain error. *State v. Yarbrough*, 104 Ohio St.3d 1,

2004-Ohio-6087, 817 N.E.2d 845, ¶ 77. Crim.R. 52. We look to three factors to

determine whether a trial court's failure to give the accomplice instruction constitutes

plain error under Crim.R. 52(B):

> (1) whether the accomplice's testimony was corroborated by other evidence
> introduced at trial; (2) whether the jury was aware from the accomplice's
> testimony that he benefitted from agreeing to testify against the defendant;
> and/or (3) whether the jury was instructed generally regarding its duty to
> evaluate the credibility of the witnesses and its province to determine what
> testimony is worthy of belief. *State v. Kamleh*, 8th Dist. Cuyahoga No.
> 97092, 2012-Ohio-2061, ¶ 38. *See also State v. Hall*, ¶ 23.

{¶60} In this matter, defense counsel elicited information from witnesses regarding

their plea agreements, and the jury learned that they received favorable treatment as a

result of testifying against defendant. Further, the court instructed the jury that it was the

sole judge of the weight and credibility of the evidence. Therefore, we find that any error

by the court in failing to give an accomplice instruction did not rise to the level of plain

error.

{¶61} This assignment of error is without merit.

Assignment of Error Six

Defense counsel provided ineffective assistance.

**{¶62}** To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. A defendant must show that counsel acted unreasonably and that, but for counsel's errors, there exists a reasonable probability that the result of the proceeding would have been different. *Strickland* at 696; *Bradley* at paragraph three of the syllabus. In making this determination, the reviewing court must presume that counsel's conduct was competent. *Id*.

**{¶63}** King complains that the trial counsel was ineffective for failing to request a continuance following in-trial discovery, failing to interview T.H. prior to trial, and failing to request a jury instruction regarding accomplice testimony.

**{¶64}** With regard to the failure to request a continuance, the record indicates that on its own, the state decided that it would not attempt to admit evidence from the search of King's home. As a sound trial strategy, defense counsel could have determined that this was a significant concession, which would be more beneficial than a continuance.

**{¶65}** As to the failure to interview T.H., the record discloses the state agreed to stop T.H.'s testimony and allow defense counsel the opportunity to interview him. King's trial counsel terminated T.H.'s testimony during trial. Counsel then used one of T.H.'s contradictory statements (that T.H. did not see defendant with a gun, as opposed to he did

not remember seeing King with a gun) in order to support his motion for a new trial. Viewing the record as a whole, we find no deficient performance.

**{¶66}** As to the failing to request a jury instruction regarding accomplice testimony, King's trial counsel may have, as a reasonable trial strategy, determined that an additional instruction referring to these witnesses as "accomplices" may have negated the defense theory that King was simply an innocent bystander. As to the additional claim about defense counsel's failure to cross-examine the witnesses about gang affiliations, the evidence demonstrated that defense counsel elicited that G.B. was in a gang and that A.K. and P.L. were in the same gang. In short, there was extensive cross-examination about the members of this gang and their affiliate gang. (Tr. 924.) This claim therefore lacks a factual basis in the record.

**{¶67}** This assignment of error lacks merit.

**{¶68}** Judgment affirmed in part, reversed in part and remanded in order to reflect that there is no conviction under Count 7, which was dismissed by the state.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
TIM McCORMACK, J., CONCUR